*241 N. PATRICK CROOKS, J.
¶ 1. This case is before the court on certification from the court of appeals pursuant to Wis. Stat. § 809.61 (2009-10). It concerns a dispute over the enforceability of a pension award in a divorce judgment. The specific question we address is whether the circuit court erred when it denied Patricia Johnson's motion for the entry of a qualified domestic relations order (QDRO) on the grounds that the motion was barred by Wis. Stat. § 893.40, a statute of repose,[1] which states that "action upon a judgment or decree . . . shall be commenced within 20 years after the judgment or decree is entered or be barred." Johnson had filed a motion on September 13, 2010, seeking to compel Michael Masters to provide pension information so that the necessary QDRO could be prepared and his Wisconsin Retirement System (WRS) pension could be divided in accordance with the judgment of divorce. The judgment in the divorce had been filed more than 20 years before, on July 20, 1989. With regard to the pension benefits, the judgment had awarded Johnson half of the value accrued during the span of the marriage and stated that a QDRO "shall be submitted to secure these rights."
¶ 2. This court has upheld the application of Wis. Stat. § 893.40 in a family law context.[2] We see no evidence for the argument that the legislature intended *242 for family law judgments to be categorically exempted from its application though we recognize the realities of family court judgments and see some evidence that this court has made certain accommodations for the ongoing obligations that are common in that area. There is a twist in this case, however, that we consider dispositive of the question, and that is the fact that even though the 1989 judgment required the filing of a QDRO, the WRS was not authorized under statute to accept a QDRO related to this divorce until May 2, 1998.
¶ 3. In order to interpret the relevant statutes to avoid "absurd or unreasonable results,"[3] and in order to "constru[e] each in a manner that serves its purpose"[4] as we are bound to do, we hold that Johnson's motion is not barred by the operation of Wis. Stat. § 893.40. The judgment contained a provision that required the filing of a QDRO with the WRS, and it was not until 1998 that legislation authorized WRS to accept such orders for marriages such as this one that were terminated in 1989. It would be absurd and unreasonable to construe the statute of repose in such a way that it would begin to run at the time of a judgment with regard to a provision that assigned Masters' interest contrary to existing law, which was and continued for the next nine years to be that WRS pension interests were not assignable. *243 [5] Construing the statute as starting to run as to the pension provision at the point when the provision was no longer contrary to law is a way to retain the statute's limiting function "in a manner that serves its purpose." Under the circumstances present in this case[6] where a statute precludes a provision in a judgment, the statute of repose cannot begin to run as to that provision until the legislature changes the law such that the provision can be carried out. In this case, that change went into effect on May 2, 1998, and the statute of repose will bar actions on such a provision only after May 1, 2018. We therefore reverse the order of the circuit court and remand for further proceedings consistent with this opinion.
BACKGROUND
¶ 4. The circuit court's order that we review denied Johnson's motion for the entry of a QDRO and granted Masters' motion to dismiss based on Wis. Stat. § 893.40. The QDRO that Johnson sought from the Waukesha County Circuit Court, the Honorable Kathryn W Foster presiding, is an order that would authorize the administrator of Masters' pension plan, the Wisconsin Retirement System, to assign Johnson a *244 portion of his pension benefits, in accordance with the divorce judgment. It is important to provide a brief explanation of what a QDRO is and why there was no authority for the WRS to accept one when Johnson and Masters divorced in 1989.
¶ 5. QDROs are defined by the Employee Retirement Income Security Act (ERISA), the federal law that governs private sector pension plans. "The primary objective of ERISA is to protect employees from the mismanagement of funds set aside to finance employee benefits and pensions by establishing a comprehensive regulatory scheme that required employers to fulfill certain reporting, disclosure and fiduciary duties." Aurora Med. Group v. DWD, 2000 WI 70, ¶ 16, 236 Wis. 2d 1, 612 N.W.2d 646 (citations omitted). Federal law generally prohibits assigning pension benefits; however, it provides a mechanism in QDROs to assign pension benefits under certain circumstances:
[T]he anti-alienation provision in [the Employee Retirement Income Security Act] precludes assignment of the pension benefits [without] a valid QDRO. See 29 U.S.C. § 1056(d)(1) ("[e]ach pension plan shall provide that benefits provided under the plan may not be assigned or alienated"). ERISA's prohibition on the assignment or alienation of pension benefits has been strictly enforced. A QDRO is an express exception to ERISA's anti-alienation provision. See ERISA § 1056(d)(3)(B)(i)(I).... 29 U.S.C. § 1056(d)(3)(B)(i) defines a "qualified domestic relations order" as a domestic relations order
(I) which creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan, and
*245 (II) with respect to which the requirements of sub-paragraphs (C) and (D) are met....
In re Gendreau, 191 B.R. 798, 801-02 (B.A.P 9th Cir. 1995) affd, 122 F.3d 815 (9th Cir. 1997) (citations omitted). "A qualified domestic relations order permits payment of benefits of qualified private retirement plans to one other than the employee spouse. Such a recipient is denominated an 'alternate payee,' which includes a nonemployee spouse." Schinner v. Schinner, 143 Wis. 2d 81, 86 n.l, 420 N.W.2d 381 (Ct. App. 1988) (citations omitted).
¶ 6. ERISA does not apply to government retirement plans such as the WRS, see 29 U.S.C.A. § 1003(b)(1), and the Wisconsin statutes that governed those plans initially made no provision for QDROs. In Lindsey v. Lindsey, the court of appeals described an early unsuccessful attempt to pass legislation authorizing the Wisconsin Retirement System to accept QDROs:
1985 Assembly Bill 689 was a proposal to create a procedure whereby a participant's accumulated rights and benefits under the Wisconsin Retirement System could be made the subject of a "qualified domestic relations order." See Analysis by the Legislative Reference Bureau to 1985 Assembly Bill 689. The fiscal note to this proposed legislation observed that "[t]he statutes governing the Wisconsin Retirement System (WRS) do not provide a mechanism for dividing rights and benefits under the system to comply with a court order." "The purpose of this bill is to provide a mechanism for the division of WRS benefits pursuant to a qualified domestic relations order issued by a court in a manner similar to that established by Federal law for private sector pension plans." Report of Joint Survey Committee on Retirement Systems for 1985 Assembly Bill 689 (emphasis added). This proposed legislation failed to pass the Assembly.
*246 Lindsey v. Lindsey, 140 Wis. 2d 684, 694 n.8, 412 N.W.2d 132 (Ct. App. 1987). The state of the law in Wisconsin in 1989 was that benefits, rights and interests of any WRS member "shall not be assignable, either in law or equity, or be subject to execution, levy, attachment, garnishment or other legal process except as specifically provided in this section[,]" and no provisions were included for QDROs. Wis. Stat. § 40.08(1) (1987-88). That remained the law until the passage of 1989 Wis. Act 218, which authorized WRS to accept QDROs beginning April 28, 1990, but did not apply retroactively to divorces occurring prior to the new statute's effective date, which was April 28, 1990. It was not until May 2, 1998, that WRS was authorized by 1997 Wis. Act 125 to accept QDROs related to divorces that became effective between January 1, 1982, and April 28, 1990. In part, 1997 Wis. Act 125 stated,
40.08(lm)(k) of the statutes is created to read:... [A] court may revise or modify a judgment or order specified under subd. 1. for participants whose marriages were terminated by a court on or after January 1, 1982, and before April 28,1990, but only with respect to providing for payment in accordance with a qualified domestic relations order of benefits under the Wisconsin retirement system that are already divided under the judgment or order.
1997 Wis. Act 125, § 5. That authorization closed a gap that had been created by the earlier legislation authorizing WRS to accept QDROs but failing to state clearly that it applied retroactively to divorces that became final after January 1, 1982 and before April 28, 1990.
¶ 7. The final judgment in Johnson and Masters' divorce was entered on July 20, 1989, so it fell into the category of divorces that were covered by the change in the law that took effect in 1998 with regard to QDROs. *247 The judgment stated that the Marital Agreement between the parties was appended to the judgment and was "approved as reasonable" and was incorporated into the judgment of the circuit court. The Marital Agreement included the following provisions:
V Property Division - Pension
The Petitioner shall be awarded [half] of the value of the Respondent's Wisconsin Retirement System benefits accrued from date of marriage thr[ough] the date of divorce. A QDRO shall be submitted to secure these rights.
X. Execution of documents
Now or in the future, upon demand, the parties agree to execute and deliver any and all documents which may be necessary to carry out the terms and conditions of this marital agreement.
XII. Divesting of property rights
Except as otherwise provided for in this marital agreement, each party shall be divested of and each party waives, renounces and gives up pursuant to Wis. Stats. § 861.07, all right, title and interest in and to the property awarded to the other. All property and money received and retained by the parties shall be the separate property of the respective parties, free and clear of any right, title, interest or claim of the other party, and each party shall have the right to deal with and dispose of his or her separate property as fully and effectively as if the parties had never been married.
XIII. Mutual releases
Neither party may, at any time hereafter, sue the other, or his or her heirs, personal representatives or assigns, *248 for the purpose of enforcing any or all of the rights relinquished and/or waived under this marital agreement. Both parties also agree that in the event any suit shall be commenced, this release, when pleaded, shall be and constitute a complete defense to any such claim or suit so instituted by either party.
XX. Survival of marital agreement after judgment
Both parties agree that certain paragraphs of this marital agreement shall survive the subsequent judgment of divorce and shall have independent legal significance. This marital agreement is a l[e]gally binding contract, entered into for good and valuable consideration. In the future, either party may enforce this specific marital agreement in this or any other court of competent jurisdiction.
¶ 8. In April 2009, nearly 20 years after the divorce was final, Masters retired from his job as a school janitor. It is undisputed that Masters did not notify Johnson that he was retiring. According to an undisputed affidavit in the record, Johnson learned in March 2010 that Masters had retired. On March 3, 2010, Johnson filed a form QDRO that was signed by the circuit court on March 5, 2010, and vacated by stipulation of the parties 24 days later when it was discovered that it contained an error. Johnson then retained new counsel and took steps to obtain a valuation of the pension and draft a QDRO to obtain her portion of the pension.
¶ 9. When WRS notified Johnson that Masters' authorization was required in order to disclose the pension value information, she sought his authorization. On September 7, 2010, Johnson received notification that Masters would not provide the necessary *249 authorization. Johnson then filed a motion on September 12, 2010, for orders to require Masters to release his pension information. At a hearing before a court commissioner, Masters was ordered to sign the authorization. He then moved for a hearing de novo in the circuit court.
¶ 10. In the circuit court, Masters moved to dismiss the motion on the grounds that Johnson's motion was barred by Wis. Stat. § 893.40 because it states that action must be commenced within 20 years after "the judgment or decree is entered," and it includes no exemptions for family law judgments. In the alternative, he argued that the doctrine of laches barred Johnson's claim because her delay in seeking the QDRO was unreasonable and prejudiced him. Johnson argued that the statute of repose could not operate as a bar to her motion in light of Wis. Stat. § 767.01, in Ch. 767, Actions Affecting the Family, which states that "circuit courts... have authority to do all acts and things necessary and proper in those actions and to carry their orders and judgments into execution as prescribed in this chapter." Alternatively, Johnson argued that the doctrines of unclean hands and equitable estoppel precluded Masters' statute of repose defense.[7] The circuit court held two hearings on the matter, and the parties briefed the issues extensively.
¶ 11. The circuit court granted Masters'motion to dismiss based on Wis. Stat. § 893.40, and it denied his motion to dismiss based on the doctrine of laches. It denied Johnson's motion for the entry of a QDRO. In ruling from the bench, the circuit court stated:
*250 The, quote, cause of action, the ability to obtain a QDRO, was not directly triggered by the actual retirement of Mr. Masters. It was, in fact, a result of a 1989 divorce decree and after the passage of the Wisconsin Act of 125 in 1997 was subject to be executed from that time going forward, not contingent on the retirement date of Mr. Masters.[8]
¶ 12. Johnson appealed the denial of her motion.[9] The court of appeals certified the case to this court, and we accepted certification.
DISCUSSION
¶ 13. The question presented by this case is how the statute that requires "action upon a judgment or decree" to be "commenced within 20 years" applies to a judgment containing a provision that cannot be performed under existing law at the time of judgment. It is a question of statutory interpretation, a question of law that this court reviews de novo. Teschendorf v. State Farm Ins. Cos., 2006 WI 89, ¶ 9, 293 Wis. 2d 123, 717 N.W.2d 258. We begin with established principles of statutory interpretation:
Statutory language is given its common, ordinary, and accepted meaning, except that technical or specially-defined words or phrases are given their technical or *251 special definitional meaning. Context is important to meaning. So, too, is the structure of the statute in which the operative language appears. Therefore, statutory language is interpreted in the context in which it is used; not in isolation but as part of a whole; in relation to the language of surrounding or closely-related statutes; and reasonably, to avoid absurd or unreasonable results.
State ex rel. Kalal v. Circuit Court for Dane County, 2004 WI 58, ¶¶ 45-46, 271 Wis. 2d 633, 681 N.W.2d 110 (citations omitted). "Under the ordinary rules of statutory interpretation statutes should be reasonably construed to avoid conflict. When two . statutes conflict, a court is to harmonize them, scrutinizing both statutes and construing each in a manner that serves its purpose." State v. Szulczewski, 216 Wis. 2d 495, 503, 574 N.W.2d 660 (1998).
¶ 14. We considered a related question concerning the interpretation of Wis. Stat. § 893.40 in Hamilton v. Hamilton, 2003 WI 50, 261 Wis. 2d 458, 661 N.W.2d 832, which involved an action by the State to collect child support arrearages "almost 30 years after the original judgment, more than 20 years after the amended judgment, and more than 15 years after [the] youngest child reached the age of majority." Id. at ¶ 2.
We hold that Wis. Stat. § 893.40, which became effective on July 1, 1980, governs the time within which a party may bring an independent action to collect child support arrearages that accumulated after the statute's effective date. In addition, we conclude that, under the statute, an action brought to enforce a child support judgment must be commenced within 20 years of the date when the judgment is entered. The period of limitation begins to run upon entry of judgment, irrespective of whether any payment under that judgment has been missed.
Id., ¶ 4.
*252 ¶ 15. The parties' arguments with regard to statutory interpretation focus on the question of whether the legislature intended to subject family law judgments to Wis. Stat. § 893.40 or to exempt them from it. The statute states:
Action on judgment or decree; court of record. Except as provided in s. 846.04(2) and (3) and 893.415, action upon a judgment or decree of a court of record of any state or of the United States shall be commenced within 20 years after the judgment or decree is entered or be barred.
Johnson argues that her motion is not "action upon a judgment or decree" for purposes of Wis. Stat. § 893.40. She points to Wis. Stat. § 801.02 as providing guidance for defining the terms "action" and "commence." The statute states:
[A] civil action in which a personal judgment is sought is commenced as to any defendant when a summons and a complaint naming the person as defendant are filed with the court, provided service of an authenticated copy of the summons and of the complaint is made upon the defendant under this chapter within 90 days after filing.
Because her motion did not commence with a summons and complaint, she argues, it does not constitute "action" within the meaning of Wis. Stat. § 893.40. She also points to language from a footnote in this court's decision in Hamilton:
The court of appeals noted that hoth Walter and the State agree that the State's motion is an "independent action" upon the judgment. Apparently, neither party argues that the State could not bring a motion within the context of the original action. We do not address this issue because it has no bearing on our present decision.
*253 Hamilton, 261 Wis. 2d 458, ¶ 9 n.4 (citations omitted). She argues that language means that the applicability of the statute of repose depends on a distinction between an "independent action" and "a motion within the context of the original action." She contends that the Hamilton footnote signaled that the court wished to limit the application of the statute of repose in the family law context to independent actions brought by third parties.[10]
¶ 16. Masters argues that the language of Wis. Stat. § 893.40 is unambiguous and makes no exceptions that would exempt Johnson's motion from being barred 20 years after the date of the judgment. He argues that this court's holding in Hamilton is that Wis. Stat. § 893.40 applied to bar an action in a child support case, and it should be dispositive of this case. He argues that it would contravene the statute's language and would nullify the statute if the court were to carve out an *254 exception for family law judgments or make a distinction between actions begun by motion and those begun by summons and complaint. He argues that the legislature made it clear that it had no intention of exempting post-judgment actions in family law cases from the requirements of the statute of repose because it did actually enact a specific exemption in 2003 in response to Hamilton and limited that exemption to actions for child support.[11]
¶ 17. We first address why Hamilton does not answer the question presented in this case. First, we note that the footnote on which Johnson relies at most implies only that a legally meaningful distinction may exist between an "independent action" on a judgment and "a motion within the context of the original action." It does not necessarily stand for the proposition that Hamilton "has no application to post-judgment motions brought between the original divorcing parties pursuant to Wis. Stat. § 767.281 within the action itself." App. Br. at 7. That far overstates a footnote that stated only, "We do not address this issue because it has no bearing on our present decision." Hamilton, 261 Wis. 2d 458,
*255 ¶ 9 n.4. Further, the holding of the case is stated elsewhere in the decision as "under the statute, an action brought to enforce a child support judgment must be commenced within 20 years of the date when the judgment is entered." Id. at ¶ 4 (emphasis added). That language would appear to include an action "between the original divorcing parties."
¶ 18. Masters considers Hamilton's holding dis-positive of this case because he would apply the statute here in the same way as the court did in Hamilton to bar the action. But we have already stated that we consider a crucial fact in this case to be that a QDRO could not be assignable until permitted by the legislature. That fact makes this case distinguishable from Hamilton. The provision the State sought to enforce in that case was a provision ordering child support payments, and there was no statute existing at the time of the judgment that prevented the filing of the proper documents to carry out that judgment. Therefore, though it addresses similar issues and contains helpful language with regard to the application of Wis. Stat. § 893.40, Hamilton does not govern the analysis here.
¶ 19. This case raises thorny questions. Wisconsin Stat. § 893.40 cannot be said to be ambiguous as to the time limitation. While it does not define "action on a judgment," it does state clearly that the time period during which action on a judgment or decree must be commenced is "within 20 years after the judgment or decree is entered." And yet, we find that the facts of the case before us compel a more careful look. As we have explained, the 1989 divorce judgment required a filing of a QDRO. The statute that authorized WRS to accept such a filing in this divorce did not come into existence until nine years later when the legislature passed 1997 Wis. Act 125. We cannot apply this statute of repose *256 without recognizing the fact that, at the time of the judgment, a statute actually foreclosed for nine years the single action, crucial to the pension's assignability, that had to occur to secure the pension award. That is the crux of this case.
¶ 20. This court, in a previous case, considered the application of a statute that appeared to be unambiguous yet had troubling implications appearing to lead to a disturbing outcome if applied literally.[12] In Teschendorf, this court unanimously agreed to affirm a court of appeals ruling refusing to apply a reducing clause in an uninsured motorist provision in an auto insurance policy. The question there involved construing Wis. Stat. § 632.32(5)(i), which authorizes such reducing clauses, and determining whether it applied where worker's compensation payments were made to the State of Wisconsin Work Injury Supplemental Benefit Fund. Although the court was unanimous in affirm *257 ing, the justices were evenly divided on whether the statute in question was ambiguous.[13] The position of three justices was that
[a]lthough the meaning of the statute appears to be plain, a literal application of the language would be absurd. As a general rule, courts apply the ordinary and accepted meaning of statutory language, unless it produces an absurd result. Seider, 236 Wis. 2d 211, ¶ 32, 612 N.W.2d 659. Because a literal application ... would produce an absurd and unreasonable result in certain situations, Justices Wilcox, Crooks, and Butler construe the statute to avoid that result.
Teschendorf, 293 Wis. 2d 123, ¶ 32. After setting forth examples of how the statute if applied as unambiguously written would create untenable results in certain circumstances, the opinion adds, "Because this literal interpretation produces absurd results and defies both common sense and the fundamental purpose of [the statutes governing worker's compensation and uninsured motorist coverage], Justices Wilcox, Crooks, and Butler reject it unless extrinsic sources reveal the legislature intended these consequences." Id., ¶ 43 (citing to Green v. Bock Laundry Mach. Co., 490 U.S. 504, 527 (1989) (Scalia, J., concurring) ("We are confronted here with a statute which, if interpreted literally, produces an absurd, and perhaps unconstitutional, result. Our task is to give some alternative meaning to the word 'defendant' in Federal Rule of Evidence 609(a)(1) that avoids this consequence . . . .")).
*258 ¶ 21. The reasoning followed by three justices in Teschendorf, as well as that followed by the court in Wenke v. Gehl Co.,[14] is apropos in this case. As with the statutes involved in Teschendorf, the application of Wis. Stat. § 893.40 in certain circumstances may produce results that "def[y] both common sense and the fundamental purpose" of the statute. The judgment here has the flaw, as to the pension award provision, that under the statute then in effect the pension was not assignable. Where the statute clearly states that WRS pension interests "shall not be assignable, either in law or in equity," and a court entered a judgment with a provision assigning such an interest, that fact must be taken into account.[15]
¶ 22. In the case under review, the dispositive fact in our view is that the statute operated to prohibit pension interests from being assigned at the time the *259 judgment was entered. We do note that there might be other grounds as well for reaching the result we reach, founded on the unique characteristics of family law judgments. In family law matters especially, courts often encounter provisions in orders that create continuing obligations that may very well extend beyond 20 years, such as support, maintenance, property transfers, agreements for the sale of property, and educational expenses payments. We have recognized the unique nature of family law judgments in another context, which lends support to our holding. Rules promulgated by this court, which of course are procedural and not substantive, do treat family law orders differently from others in one telling respect. They set the required minimum time periods for courts to retain "the original paper records" for various types of cases. See SCR 72.01, Retention of original record. As might be expected, the minimum time periods set for courts to retain records for various types of cases corresponds to the relevant statute limiting enforcement of the judgment. For example, civil case files and records of money judgments are to be retained for 20 years, consistent with Wis. Stat. § 893.40's 20-year limitation on enforcing such judgments. See SCR 72.01(1) and (5). The retention requirements for delinquent income or franchise tax warrants or liens are tied directly to relevant statutes regarding their enforcement, and the rule notes that for warrants or liens that are renewed, "a new 20-year retention period begins from the date on which the renewal is filed with the clerk of circuit court." See SCR 72.01(7m).
¶ 23. With regard to family case files, family court records, family court minute records and maintenance and support payment records, the rule departs from the practice of tying the retention period to a recognized *260 limitation on enforcing judgments and instead sets the required minimum for retaining such records as follows:
[Thirty] years after entry of judgment of divorce, legal separation, annulment, or paternity, or entry of a final order, except that after 30 years, for any case file for which related support or maintenance payments are continuing to be made, 7 years after final payment or after an order terminating maintenance is filed.
See SCR 72.01(11), (12), (13), and (14). We suggest only that these procedural rules reflect a recognition on the part of this court that in some respects ongoing obligations are a common feature of family law judgments, and whether observing the obligation to construe statutes to avoid absurd results or exercising their equitable powers, circuit courts, under Wis. Stat. § 767.01, in Ch. 767, Actions Affecting the Family, "have authority to do all acts and things necessary and proper in those actions and to carry their orders and judgments into execution as prescribed in this chapter."
¶ 24. For example, in Bliwas v. Bliwas, 47 Wis. 2d 635,178 N.W.2d 35 (1970), we considered a stipulation in which the divorcing couple had agreed that the father would "pay the cost of tuition, books, supplies, rent, food allowance and certain miscellaneous expenses" for his son's college and graduate professional expenses in a Wisconsin school even beyond his twenty-first birthday; the court-ordered support payments, however, would be lowered and would then terminate on the son's twenty-first birthday. Id. at 637. While the question presented in that case had to do with the proper procedural method for bringing the father, who was not complying with the stipulation, into court, we addressed at some length the basis for enforcing the stipulation:
However, we hold that the enforcement of a family court order, which would not be enforceable without a *261 prior stipulation of the parties that it be made part of the decree, rests not so much in the enforcement of a contractual obligation or even extension of jurisdiction of the court, as it does in recognizing that a person who agrees that something be included in a family court order, especially where he receives a benefit for so agreeing, is in a poor position to subsequently object to the court's doing what he requested the court to do. One leading text puts the proposition involved in the following language: "[W]here the court disposes of the property of the parties by stipulation . . . the general rule applies that a party who procures or consents to the entry of the decree is estopped to question its validity, especially where he has obtained a benefit from it."
Id. at 639-40. The decision went on to quote from another jurisdiction in support of such a rule:
In a case where a wife had received certain advantages under the award of the divorce court, made pursuant to a stipulation of the parties, the Supreme Court of the State of Washington held it to be well established law that, "... even though a decree is void as beyond the power of the court to pronounce, a party who procures or gives consent to it is estopped to question its validity where he has obtained a benefit therefrom."
Id. at 640 (citing Svatonsky v. Svatonsky, 389 P.2d 663, 663 (Wash. 1964)).
¶ 25. Though we do not decide this case on grounds of equitable estoppel, it appears to support our decision and to provide independent grounds for our holding. We have addressed the doctrine in similar cases, and in Rintelman v. Rintelman, 118 Wis. 2d 587, 596, 348 N.W.2d 498 (1984), we held:
In situations such as this one, all that need be shown to constitute an estoppel is that both parties entered into the stipulation freely and knowingly, that the overall settlement is fair and equitable and not illegal or against public policy, and that one party subsequently *262 seeks to be released from the terms of the court order on the grounds that the court could not have entered the order it did without the parties' agreement.
We recently addressed a related issue where a stipulation and order established a 33-month unmodifiable floor for child support payments, and a party was seeking modification of the order. In May v. May; we emphasized courts' deference to parties' stipulations: "[W]e are sensitive to the importance and prevalence of stipulations in helping families going through difficult and litigious divorces and curbing disagreements [between] the parties. The ability to contract is fundamental to our legal system and may aid parties in settling their divorces more amicably." May v. May, 2012 WI 35, ¶ 18, 339 Wis. 2d 626, 813 N.W.2d 179. The court went on to add:
[W]here the parties to a child support order have entered into a stipulation in regard to child support for a limited period of time that the court has adopted, courts will attempt to give effect to the parties' intentions where the stipulation was entered into freely and knowingly, was fair and equitable when entered into, and is not illegal or violative of public policy. In this context, a court's review typically will consider the doctrine of equitable estoppel, by which a party may be precluded from challenging an agreement when the elements of estoppel set forth in Rintelman are satisfied.
Id.., ¶ 36 (citation omitted). We recognize the elements of estoppel in several key provisions in the stipulation here that was incorporated into the judgment:
X. Execution of documents
Now or in the future, upon demand, the parties agree to execute and deliver any and all documents which may be necessary to carry out the terms and conditions of this marital agreement.
*263 XII. Divesting of property rights
Except as otherwise provided for in this marital agreement, each party shall be divested of and each party waives, renounces and gives up pursuant to Wis. Stats. § 861.07, all right, title and interest in and to the property awarded to the other. All property and money received and retained by the parties shall be the separate property of the respective parties, free and clear of any right, title, interest or claim of the other party, and each party shall have the right to deal with and dispose of his or her separate property as fully and effectively as if the parties had never been married.
XIII. Mutual releases
Neither party may, at any time hereafter, sue the other, or his or her heirs, personal representatives or assigns, for the purpose of enforcing any or all of the rights relinquished and/or waived under this marital agreement. Both parties also agree that in the event any suit shall be commenced, this release, when pleaded, shall be and constitute a complete defense to any such claim or suit so instituted by either party.
In light of these provisions as agreed upon by the parties, the doctrine of equitable estoppel supports our holding where Masters had promised in 1989 "in the future, upon demand,... to execute and deliver any and all documents which may be necessary to carry out the terms and conditions of this marital agreement."
CONCLUSION
¶ 26. In order to interpret the relevant statutes to avoid "absurd or unreasonable results," and in order to "constru[e] each in a manner that serves its purpose" as we are bound to do, we hold that Johnson's motion is *264 not barred by the operation of Wis. Stat. § 893.40. The judgment required the filing of a QDRO with the WRS, and it was not until 1998 that legislation authorized WRS to accept such orders for marriages such as this one that were terminated in 1989. It would be absurd and unreasonable to construe the statute of repose in such a way that it would begin to run at the time of a judgment with regard to a provision that assigned Masters' interest contrary to existing law, which was and continued for the next nine years to be that WRS pension interests were not assignable. Construing the statute as starting to run as to that provision at the point when the provision was no longer contrary to law is a way to retain its limiting function "in a manner that serves its purpose." Under the circumstances present in this case where a statute precludes a provision in a judgment, the statute of repose cannot begin to run as to that provision until the legislature changes the law such that the provision can be carried out. In this case, that occurred on May 2, 1998, and the statute of repose will bar actions on that provision after May 1, 2018. We therefore reverse the order of the circuit court and remand for further proceedings consistent with this opinion.
By the Court. — Reversed and remanded.

 We address the question as presented in the certification by the court of appeals and as briefed by the parties. We do not attempt to answer questions not raised by the certification.

 That case involved an action by the State to enforce payment of child support that had been ordered in a divorce judgment. We held that Wis. Stat. § 893.40 governed the case. *242 We said, "[U]nder the statute, an action brought to enforce a child support judgment must be commenced within 20 years of the date when the judgment is entered. The period of limitation begins to run upon entry of judgment, irrespective of whether any payment under that judgment has been missed." Hamilton v. Hamilton, 2003 WI 50, ¶ 4, 261 Wis. 2d 458, 661 N.W.2d 832.

 State ex rel. Kalal v. Circuit Court for Dane County, 2004 WI 58, ¶ 46, 271 Wis. 2d 633, 681 N.W.2d 110.

 State v. Szulczewski, 216 Wis. 2d 495, 503, 574 N.W.2d 660 (1998).

 Wis. Stat. § 40.08(1) (1987-88), in effect at the time of the 1989 divorce judgment, stated:
The benefits payable to, or other rights and interests of, any member, beneficiary or distributee of any estate under any of the benefit plans administered by the department... shall not be assignable, either in law or equity, or be subject to execution, levy, attachment, garnishment or other legal process except as specifically provided in this section.

 We address the question as presented in the certification by the court of appeals and as briefed by the parties. We do not attempt to answer questions not raised by the certification.

 The parties' briefs to the circuit court contained other arguments that are not recited here because they were not pursued on appeal.

 The circuit court also stated that the doctrine of laches would favor the petitioner's position except that it "runs full face into the stone wall in the form of the statute of repose." The circuit court expressed its belief that the result was inequitable: "I frankly hope I am wrong [if the case is appealed] because I do believe my decision is a harsh result."

 Masters cross-appealed the denial of his motion to dismiss based on the doctrine of laches; he filed a notice of voluntary dismissal of his cross-appeal on October 6, 2011.

 Johnson's other argument is that her interest in the pension plan was created at the time the judgment was entered and that she is therefore "entitled to seek enforcement of the terms of the divorce judgment at any time ...." App. Br. at 12. For that proposition, she cites Dewey v. Dewey, 188 Wis. 2d 271, 279, 525 N.W.2d 85 (Ct. App 1994) (holding that the former wife's "interest in one-half of [the former husband's] pension was not a part of his bankruptcy estate nor was it a discharge-able debt. It was [the former wife's] separate property upon which the timing of the execution of the QDRO had no effect.") We note that the "timing of the execution of the QDRO" in that case refers to the significance of the timing before or after a bankruptcy action; the language cannot be fairly characterized as standing for the proposition that timing is of no consequence whatsoever. In that case, there was no discussion of a statute of repose; the former wife's action to enforce the judgment was commenced two years after the judgment was entered. In any case, we decide this case on other grounds and need not address this argument further.

 Following this court's decision in Hamilton, the legislature accepted the court's invitation to clarify its intention with regard to limitations on actions to collect child support owed under a judgment. It passed 2003 Wis. Act 287, which created Wis. Stat. § 893.415. The statute states in relevant part:
(2) An action to collect child or family support owed under a judgment or order entered under ch. 767, or to collect child support owed under a judgment or order ... shall be commenced within 20 years after the youngest child for whom the support was ordered under the judgment or order reaches the age of 18 or, if the child is enrolled full-time in high school or its equivalent, reaches the age of 19.
Wis. Stat. § 893.415.

 It is the court's role, in the context of statutory interpretation, to give effect to legislation unless we find that the legislature could not have intended the absurd or unreasonable results a statute appears to require. As we have stated:
The purpose in this situation is to verify that the legislature did not intend these unreasonable or unthinkable results. See Green v. Bock Laundry Mach. Co. , 490 U.S. 504, 527 (1989) (Scalia, J., concurring); Kalal, 271 Wis. 2d 633, ¶ 52 n.9, 681 N.W.2d 110; see also Public Citizen v. United States Dep't of Justice, 491 U.S. 440, 465 (1989) (invoking the Supreme Court's absurdity exception to the plain language of the statute); Robbins v. Chronister, 402 F.3d 1047, 1050 (10th Cir. 2005) (collecting federal circuit court and Supreme Court cases applying the absurdity exception). Because our purpose in these situations is grounded in open disbelief of what a statute appears to require, we are bound to limit our off-statute investigations to obvious aberrations.
Teschendorf v. State Farm Ins. Cos., 2006 WI 89, ¶ 15, 293 Wis. 2d 123, 717 N.W.2d 258.

 Chief Justice Shirley Abrahamson took a different position on the statutory construction approach and concurred in the holding. Teschendorf, 293 Wis. 2d 123, ¶ 70 (Abrahamson, C.J., concurring) (writing that "[a] better approach to statutory construction would be to drop the ambiguous/unambiguous/ literal/plain meaning pretense and instead take a comprehensive view of statutory interpretation").

 For another instance when this court has confronted apparently dispositive clear language in a source of law that was ultimately held not to be dispositive of the issue, see Wenke v. Gehl Co., 2004 WI 103, ¶ 49, 274 Wis. 2d 220, 682 N.W.2d 405 (noting that "[t]he language of these [Judicial Council] Committee Notes [setting forth the legislative intent] does appear, on its face, to speak exactly to Wenke's construction of both §§ 893.05 and 893.07" but nonetheless adopting a contrary interpretation of the legislative intent in light of "a largely unperceived shift in the meaning attached to the phrase 'statute of repose.1")

 The record does not disclose whether the original counsel perhaps believed that the legislature would authorize QDROs and that it would eventually be possible to file one in accordance with the judgment of divorce, but as we noted above, attempts were being made to pass such legislation as early as 1985. Bills authorizing QDROs were introduced on February 21 and March 15, 1989, and were pending at the time the divorce judgment was entered in July. The following year 1989 Wis. Act 218 became law, but as explained above, its provisions did not cover divorces granted between January 1, 1982 and April 28, 1990.