# IN THE SUPREME COURT OF IOWA

No. 15–1456

Filed June 30, 2017

Amended September 6, 2017

**DAKOTA, MINNESOTA & EASTERN RAILROAD
d/b/a CANADIAN PACIFIC,**

Plaintiff,

vs.

**IOWA DISTRICT COURT FOR LOUISA COUNTY,**

Defendant.

---

Certiorari to the Iowa District Court for Louisa County, Michael J. Schilling, Judge.

The owner of a railroad right-of-way and bridge challenges a district court order finding it in contempt for violating a 1977 judgment imposing an injunction against a prior owner of the right-of-way and bridge. **WRIT SUSTAINED; CONTEMPT ORDER VACATED.**

Kerry A. Finley and Nancy J. Penner of Shuttleworth & Ingersoll, P.L.C., Cedar Rapids, and Daniel P. Kitchen, Washington, for plaintiff.

William Scott Power of Aspelmeier, Fisch, Power, Engberg & Helling, P.L.C., Burlington, for defendant.

**HECHT, Justice.**

An injunction was issued by judgment in 1977 against the owner of a railroad right-of-way directing it to reconstruct a dike designed to channel creek water under the railroad's bridge and away from adjacent farmland. Nearly forty years later, a drainage district that was joined as a defendant in the earlier litigation asked the district court to hold a subsequent purchaser of the right-of-way in contempt for willfully violating the injunction. The district court found the subsequent purchaser in contempt for failing to reconstruct and maintain the dike. In this certiorari proceeding, we must determine whether a 1977 judgment granting an injunction of unspecified duration against a former owner of the right-of-way is enforceable nearly forty years later through a contempt action against a subsequent purchaser. Because we conclude the 1977 judgment expired under Iowa Code section 614.1(6) (2013) before this proceeding to enforce it was commenced, we sustain the writ and vacate the decision of the district court.

## I. Factual and Procedural Background.

**A. Whiskey Creek and Bridge 110.** Dakota, Minnesota & Eastern Railroad (DM&E) purchased the railroad right-of-way and bridge that is the subject of this dispute in 2008. Initially owned by the Chicago, Rock Island & Pacific Railroad (CRI&P), the right-of-way runs in a generally east–west direction through Muscatine and Louisa Counties in Eastern Iowa. In 1872, CRI&P built a bridge in Louisa County, referred to in the record as Bridge 110,[1] to allow the railroad tracks to

---

[1]The record also refers to Bridge 110 as Bridge 2187, the internal identification number of DM&E.

pass over Whiskey Creek,[2] a natural stream flowing east from the Mississippi River bluffs, along the northern edge of the right-of-way, past Bridge 110, and into the Muscatine Slough.[3] At times in the past, a dike turned the creek water under Bridge 110 and across farmland to the south until it drained into the Muscatine Slough.

**B. The Drainage Problem**. In the 145 years since Bridge 110 was constructed, the creek water has not consistently passed under the bridge and drained to the south. Whiskey Creek "has a steep grade" as it leaves the bluffs. *Chi., Rock Island & Pac. Ry. v. Lynch*, 163 Iowa 283, 285, 143 N.W. 1083, 1084 (1913). Especially during heavy rains, it carries significant quantities of sediment and debris that plug the channel under Bridge 110, causing water to flood and damage fields north of the bridge. In addition, the dike constructed to direct water under the bridge has repeatedly failed, causing water and debris to move parallel to the bridge, instead of under it, until it eventually drained into the slough.

Silt and debris flowing through Whiskey Creek are deposited in the Muscatine Slough, inhibiting the flow of water into and through that

---

[2]References to this waterway in the record designate it alternatively as "Whiskey Creek," "Whisky Creek," "Whiskey Hollow Creek," and "Indian Creek." Because the parties generally use the name "Whiskey Creek," we also use this name for purposes of this certiorari action.

[3]The Muscatine Slough is a closed drainage system maintained by the drainage district. It runs fourteen miles from the City of Muscatine in the north to a Louisa County pumping station in the south. It is fed by subditches and by creeks such as Whiskey Creek carrying runoff from nearby farm and timberland. In recent years, water from the City of Muscatine's storm sewers has also been pumped into the Muscatine Slough.

The Muscatine Slough is maintained by Drainage District No. 13. Organized in 1909, Drainage District No. 13 is responsible for maintaining drainage ditches, subditches, and settling basins in Muscatine and Louisa Counties. Bridge 110 is located within the district.

waterway. Over the course of a season or occasionally after a single substantial rain, the silt and debris plug the Muscatine Slough, causing water to flood and damage crops in fields north of the plugs. The drainage district has repeatedly cleared the plugs and enabled the water to again empty into the slough.[4]

**C. Prior Drainage Litigation.** The responsibility for maintaining drainage in the vicinity of Bridge 110 and the surrounding area within the drainage district has been a subject of recurring litigation for more than a century. In 1907, CRI&P closed the channel under Bridge 110, which had gradually been filling with sediment and debris, forcing the creek water to change course and travel east, parallel to the right-of-way. *Id.* at 286, 143 N.W. at 1084. As a consequence of this change in the channel of the creek, land to the north of the railroad right-of-way occasionally flooded. *Id.*

1. *1911 injunction.* In 1911, CRI&P filed an action against landowners on both sides of the bridge, seeking a declaration that CRI&P was no longer obligated to maintain the flow of water under Bridge 110 because the natural flow of Whiskey Creek had changed.[5] *Chi., Rock Island & Pac. Ry. v. Lynch*, No. 6304, at *2 (Iowa Dist. Ct. Sept. 16, 1911). The district court ruled against CRI&P, determining the natural flow of Whiskey Creek remained through the railroad's right-of-way and

---

[4]The parties dispute the frequency with which the drainage district has undertaken this task. The direct testimony of a drainage district trustee suggested the slough needs cleaning after every hard rain. On cross-examination, however, the trustee testified that the drainage district typically cleans out the slough once per year as part of its annual maintenance of the slough.

[5]The drainage district intervened in the litigation but its claim was dismissed on the ground that no right or equity of the district was at issue in the litigation between the railroad and the private landowners. *See Chi., Rock Island & Pac. Ry. v. Lynch*, No. 6304, at *2 (Iowa Dist. Ct. Sept. 16, 1911); *see also Lynch*, 163 Iowa at 289, 143 N.W. at 1086 (affirming district court's dismissal).

to the south under Bridge 110. *Id.* The district court ordered CRI&P and the landowner to the south of the railroad's right-of-way to promptly,

> remove from the old bed of said creek on their respective lands all obstructions to the natural flow of the water down and through [Bridge 110], and [directed they] shall not further or hereafter permit upon their respective properties such conditions of obstruction to exist[ ] and [shall] take such steps and perform such acts as will in a proper manner provide against the further or future diversion from its natural channel [under Bridge 110].

*Id.* at *3. We affirmed the district court's decision, but modified it to allow CRI&P and the owner of the land south of the bridge ninety days to remove the obstructions to the free flow of water through their properties. *Lynch,* 163 Iowa at 289–90, 143 N.W. at 1086.

2. *1922 covenant restriction.* In 1922, Lynch—the owner of land situated northwest of the railroad's right-of-way—conveyed land to CRI&P to be used for the fortification of the dike directing water under the railroad's bridge. The deed from Lynch to CRI&P included the following conditional language:

> This Deed made on the further condition that [CRI&P] will at all times protect and compensate the Grantor, M.F. Lynch, his heirs, executors, administrators and assigns for failure to reasonably maintain a channel of sufficient capacity to give free flow to the water under the ordinary conditions, and to be of no less capacity than the channel of Whiskey Hollow Creek immediately above and below where said Creek channel enters and leaves the property of [CRI&P].

CRI&P maintained the course of Whiskey Creek under Bridge 110 for several decades thereafter by maintaining the dike that turned the flow south and under the bridge, raising the elevation of the rails, and repeatedly dredging the creek bed southeast of Bridge 110. The dike occasionally ruptured, however, and in 1973, CRI&P stopped repairing it.

3. *1976 judgment.* Another lawsuit—cause no. 14926—was commenced in 1973. The plaintiffs, the Downers and the Baars, who

owned property northwest of Bridge 110 sued Dutton, the owner of land on the north and south side of the railroad right-of-way. The plaintiffs alleged Dutton had built a dike south of Bridge 110 and redirected the flow of Whiskey Creek across Dutton's land to the east, instead of to the south. This redirection of the creek, the plaintiffs alleged, caused the railroad's dike to fail, the former creek bed south of Bridge 110 to again fill with sand and silt, and the plaintiffs' land to flood. The Downers and the Baars sought damages for the flooding and a permanent injunction precluding Dutton's further obstruction of the natural flow of the creek south of Bridge 110. CRI&P intervened in the action, asserting its own claim for damages and injunctive relief against Dutton for causing Whiskey Creek to back up and damage the dike. The Downers and the Baars then added a claim for injunctive relief mandating that CRI&P maintain the dike and later added the drainage district as a defendant, seeking injunctive relief against that entity as well.

In late 1976, the district court issued its findings of fact and conclusions of law. The court concluded the railroad's right-of-way impeded the natural flow of water to the south and east according to the laws of gravitation, and instead redirected it to the north and east along the right-of-way. The court determined the railroad, by constructing an elevated right-of-way, assumed an obligation "not to obstruct the free passage of surface water." This obligation, the court concluded, requires a passageway that is "reasonably sufficient for the passage of water[,] taking into consideration" that "[t]he creek has always carried silt, sand, mud, trees, stumps and limbs" and "has always had a tendency to fill with silt and sand." The court further concluded CRI&P had a duty to construct opportunities at reasonable intervals for the water to cross its

right-of-way, meaning "more bridges [may be] required."[6] Noting that Lynch, the Downers' and Baars' predecessor-in-interest, had conveyed real estate to CRI&P on the condition it be used for the construction of a dike, the court concluded the plaintiffs were "entitled to an injunction against CRI&P restraining it from continuing to allow the flowage of Whiskey Creek upon plaintiffs' land and requiring it to reconstruct its collapsed dike so as to channel the creek under bridge 110." The court also concluded the plaintiffs were "entitled to a prescriptive easement for the flow of Whiskey Creek under bridge 110."

In early 1977, the court entered judgment against CRI&P enjoining it "from continuing to allow the flowage of Whiskey Creek upon plaintiffs' land" and requiring it "to reconstruct the collapsed dike in order to channel the Creek under Bridge 110." The court also granted the plaintiffs "a prescriptive easement for the flow of Whiskey Creek under Bridge 110."

**D. 1984 Contempt Proceeding Against Chicago, Milwaukee, St. Paul and Pacific Railroad Company (Milwaukee Road).** After the entry of the 1977 judgment, CRI&P began to rebuild the dike. The structure washed out again, however, before the project was completed. Meanwhile, CRI&P filed a bankruptcy petition, and in 1982 ownership of the railroad right-of-way was transferred to the Milwaukee Road.

In 1984, the drainage district filed an application in cause no. 14926—the court file in which the 1976 judgment was rendered—

---

[6]In describing the railroad's duty, the district court cited *Estes v. Chicago, Burlington & Quincy Railroad*, 159 Iowa 666, 141 N.W. 49 (1913). In that case, we approved a jury instruction stating "it is the duty of a railway company, where it crosses a stream, to provide passageways for the water of the stream reasonably sufficient to allow it to flow through without being diverted from its natural course, or being banked up so as to cause damage to the property of another." *Id.* at 670, 672, 141 N.W. at 51–52.

asking the district court to find the Milwaukee Road in contempt for failing to rebuild the dike. The district court entered a judgment holding the Milwaukee Road in contempt because the company willfully failed to comply with the injunction even though it knew of the 1977 judgment against CRI&P in 1982 and was thus on notice of the injunction mandating maintenance of the dike to permit the creek to flow under Bridge 110. The court deferred sentencing, however, giving the Milwaukee Road six months to purge itself of contempt. The Milwaukee Road rebuilt the dike and the contempt was purged.

**E. Acquisition by DM&E.** Soon after it was rebuilt by the Milwaukee Road, the dike failed yet again. Ownership of the railroad right-of-way was transferred several times thereafter. The dike had not yet been rebuilt when the Iowa, Chicago, and Eastern Railroad Company (IC&E) took ownership in 2002. During the period of IC&E's ownership, counsel for the trustees of the drainage district corresponded with IC&E, notifying it of the injunctions entered against prior owners of the right-of-way. The correspondence also communicated the drainage district's view that the dike was not functional and urged prompt repairs to restore the flow of the creek, consistent with the 1977 injunction. When DM&E acquired ownership of the railroad right-of-way and Bridge 110 in December 2008 through a merger with IC&E, the dike was still in disrepair and the drainage problem in the vicinity of the bridge had not been solved.

Communications continued between DM&E, the drainage district trustees, and affected property owners about the dike's condition of disrepair and the persistent disruption of drainage across the railroad right-of-way. DM&E retained an engineering consultant to recommend design alternatives for redirecting and maintaining the flow of Whiskey

Creek under Bridge 110. The consultant generated a report proposing three redesign alternatives in December 2010; however, DM&E did not undertake remediation, and more litigation ensued.

**F. Application for Order to Show Cause.** On February 25, 2013, the drainage district initiated this proceeding against DM&E—again in cause no. 14926. The drainage district's application asserted the 1977 judgment imposed upon DM&E "a continuing obligation to keep the collapsed dike adjacent to Bridge 110 in good and proper repair." The drainage district alleged DM&E was a "successor" to the Milwaukee Road with actual or constructive knowledge of "its continuing obligation to channel Whiskey Creek under Bridge 110" and urged the court to order the railroad to "take immediate action in compliance with the [1977] order requiring [DM&E] to keep the collapsed dike adjacent to Bridge 110 in good and proper repair" and "assess fines and/or orders" deterring DM&E from future noncompliance. The district court issued a rule to show cause ordering DM&E to appear before the court and demonstrate "wh[y] [it] should not be held in contempt."

DM&E filed a motion to dismiss the proceeding, contending a civil action, rather than a summary contempt proceeding, "is the proper means of establishing the legal rights and responsibilities related to a decades-old railroad bridge and a dike that washed out many years ago." DM&E raised several other arguments in support of its motion, including that (1) the 1977 judgment was against CRI&P, a different railroad and named party; (2) DM&E was not a party to the action in which the injunction was issued and is not a corporate successor of the enjoined railroad; (3) the 1977 district court decision appears in the court's records as a "judgment entry" and was described as a judgment in the 1984 contempt citation; (4) the 1977 judgment was satisfied when the

dike was rebuilt by another railroad in 1985; (5) enforcement of the judgment is time-barred by the statute of limitations under Iowa Code section 614.1(6); (6) the judgment is based in part on the enforceability of a real property covenant contained in the 1922 deed from Lynch to CRI&P that is unenforceable under the statute of limitations in Iowa Code section 614.24; (7) indispensable parties affected by the complex, overarching drainage issues cannot be joined in a contempt proceeding; (8) the complexity of the case and relief sought makes the contempt remedy inappropriate under the circumstances; (9) the drainage district lacks standing to bring this contempt proceeding because the 1977 judgment granted no injunctive or other relief in its favor; and (10) this contempt proceeding is preempted by the Interstate Commerce Commission Termination Act (ICCTA), 49 U.S.C. §§ 10101–16106.[7] The district court denied the motion to dismiss.

On September 30 and October 1, 2014, the court held a hearing on the application for rule to show cause. In an order filed July 31, 2015, the district court found DM&E was in contempt for violating the injunction granted by the 1977 judgment against a prior owner of the right-of-way, CRI&P. The court determined DM&E was under a legal duty to comply with the 1977 judgment enjoining CRI&P because DM&E

---

[7]The ICCTA was enacted in 1995 to restructure the country's rail system. DM&E argued that state and federal courts have held that common law claims seeking damages or injunctive relief related to floodwater or storm water caused by the operation or construction of railbeds or railroad right-of-ways are preempted under ICCTA. DM&E concluded that under the ICCTA's definitions of "regulation" and "transportation," the drainage district's attempt to force DM&E to restore the dike adjacent to Bridge 110, through the exercise of the district court's equitable or contempt powers under state law, is "regulation" of "transportation" and is thus preempted under ICCTA's express preemption clause at 49 U.S.C. § 10501(b). DM&E does not press the preemption claim in its brief filed with this court, and we do not discuss it further.

is a successor in interest to CRI&P and the Milwaukee Road, because DM&E stands in privity with the prior owners of the right-of-way, and because DM&E had actual notice of the 1977 judgment and injunction well before the rule-to-show-cause proceeding was commenced. The court found DM&E in contempt because it concluded the drainage district had proved beyond a reasonable doubt that DM&E willfully failed to reconstruct the collapsed dike, channel Whiskey Creek under Bridge 110, and prevent Whiskey Creek from flowing onto the property of adjacent private landowners. The court ordered DM&E to file a plan for purging itself of contempt by September 4, 2015.

**G. Subsequent History.** DM&E filed an application for interlocutory review and alternatively a petition for certiorari, seeking review of the district court's findings of fact, conclusions of law, and order finding contempt. We granted certiorari review and stayed further proceedings below. *See* Iowa Code § 665.11; Iowa R. App. P. 6.107(2).

## II. Scope and Standards of Review.

"Although there is no statutory right to appeal from an order to punish for contempt, the proceeding may, in the proper case, be reviewed by certiorari." *In re Inspection of Titan Tire*, 637 N.W.2d 115, 131 (Iowa 2001). We review a certiorari action for correction of errors at law because it is an action at law. *Id.* Under this standard, we accept the district court's well-supported factual findings as binding but give no deference to its legal conclusions. *State Pub. Def. v. Iowa Dist. Ct.*, 886 N.W.2d 595, 598 (Iowa 2016).

"A writ of certiorari lies where a lower board, tribunal, or court has exceeded its jurisdiction or otherwise has acted illegally." *Id.* (quoting *State Pub. Def. v. Iowa Dist. Ct. for Plymouth Cty.*, 747 N.W.2d 218, 220 (Iowa 2008)). "Illegality exists when the court's findings lack substantial

evidentiary support, or when the court has not properly applied the law." *Id.* (quoting *State Pub. Def.*, 747 N.W.2d at 220). Because contempt requires proof beyond a reasonable doubt, substantial evidence in this context consists of "such evidence as could convince a rational trier of fact that the alleged contemnor is guilty of contempt beyond a reasonable doubt." *Den Hartog v. City of Waterloo*, 891 N.W.2d 430, 435 (Iowa 2017) (quoting *Reis v. Iowa Dist. Ct.*, 787 N.W.2d 61, 66 (Iowa 2010)). "In the absence of statutory regulation, we have long held the general rule to be that decisions regarding contempts are within the sound discretion of the trial court, and unless this discretion is grossly abused, the decision must stand." *State v. Lipcamon*, 483 N.W.2d 605, 607 (Iowa 1992).

**III. Analysis.**

Among other arguments, DM&E asserts that under Iowa Code section 614.1(6), the 1977 judgment enjoining CRI&P to permit the flow of water under Bridge 110 expired in 1997, after twenty years. *See Whitters v. Neal*, 603 N.W.2d 622, 623–24 (Iowa 1999). Because the judgment granting injunctive relief was not renewed before it expired, DM&E contends it may not be held in contempt for failing to perform its mandates. We agree. Since we conclude the contempt proceedings purport to enforce an injunction that lapsed in 1997, we do not reach the other statutory, constitutional, and prudential issues raised in the district court.

**A. Background Principles.** The power to grant and enforce injunctive relief is inherent in the constitutionally vested equitable jurisdiction of a district court but may also arise by statute. *See* Iowa Const. art. V, § 6; *see also Ney v. Ney*, 891 N.W.2d 446, 450–51 (Iowa 2017). When a statute extends or restricts the remedy of injunctive relief, statutory requirements supersede equitable principles governing

the injunction's effect. *Ney*, 891 N.W.2d at 450–51; *see also Worthington v. Kenkel*, 684 N.W.2d 228, 233 (Iowa 2004).

At equity, a permanent injunction could last in perpetuity, "so long as the conditions which produce the injunction remain" in effect. *Condura Constr. Co. v. Milwaukee Bldg. & Constr. Trades Council AFL*, 99 N.W.2d 751, 755 (Wis. 1959). The duration of a permanent injunction, however, may also be subject to time limits imposed by court order or statute. *See, e.g.*, Iowa Code § 664A.5 (limiting the duration of a permanent no-contact order to "five years from the date the judgment is entered"); *Bear v. Iowa Dist. Ct.*, 540 N.W.2d 439, 441–42 (Iowa 1995) (enforcing a 1981 injunction in a 1994 contempt proceeding because the order creating it did not limit its duration).

**B. Iowa Code Section 614.1(6).** DM&E asserts that Iowa Code section 614.1 statutorily limits the time period during which the 1977 injunction against CRI&P may be enforced. Section 614.1 provides that "[a]ctions may be brought within the times herein limited, respectively . . . and not afterwards, except when otherwise specially declared." Iowa Code § 614.1. Under Iowa Code section 614.1(6), an action "founded on a judgment of a court of record" must be brought "within twenty years." *Id.* § 614.1(6). The only "specially declared" exception to this rule concerns "an action to recover a judgment for child support, spousal support, or a judgment of distribution of marital assets." *Id.*

When interpreting a statute, we seek to ascertain the legislature's intent. *See Exceptional Persons, Inc. v. Iowa Dep't of Human Servs.*, 878 N.W.2d 247, 251 (Iowa 2016). In so doing, we interpret what the legislature said, not "what it should or might have said." Iowa R. App. P. 6.904(3)(*m*). Absent an ambiguity or absurdity, we generally apply the

ordinary meaning of a statute's express terms. *See Brakke v. Iowa Dep't of Nat. Res.*, 897 N.W.2d 522, 533 (Iowa 2017). In assessing whether an exception to the plain-meaning rule should apply, we read the language in context, considering the statute's "subject matter, the object sought to be accomplished, the purpose to be served, underlying policies, . . . and the consequences of various interpretations." *See Exceptional Persons*, 878 N.W.2d at 251 (alteration in original) (quoting *State v. Albrecht*, 657 N.W.2d 474, 479 (Iowa 2003)).

**C. Discussion.** We turn first to the question of whether an application to show cause used to enforce an injunction initiates an "action" under section 614.1. The Iowa Code defines an "action" as "[e]very proceeding in court." *Id.* § 611.1. The use of the inclusive term "every" means that "proceeding" is intended to be a comprehensive term. In its most comprehensive sense, a "proceeding" is "[a]ny procedural means for seeking redress from a tribunal or agency." *Proceeding, Black's Law Dictionary* (10th ed. 2014); *see also* 1A C.J.S. *Actions* § 22, at 265 (2016) ("As ordinarily used, [proceeding] is broad enough to include all methods of invoking the action of courts . . . and is generally applicable to any step taken to obtain the interposition or action of a court." (Footnotes omitted.)).

The decision-making process initiated by an application to show cause constitutes an "action" because it is a procedural means for seeking redress from a court that has previously ordered the remedy sought and thus a "proceeding" within the plain-meaning of the word. *See* Iowa Code § 611.1. An application to show cause commences a proceeding invoking the court's contempt power to force a party to comply with the terms of a judgment. A finding of contempt can only be made against a party before the court, and only a court may punish acts

or omissions as contempt. *Id.* §§ 665.2, .3, .7. In a case like this in which the alleged contemnor is not already in the court's presence, the alleged contemnor is entitled to notice via personal service, an opportunity to appear before the court, and reasonable time to prepare an explanation under oath. *Id.* § 665.7. An application to show cause is a means of seeking a court's redress; it thus initiates a "proceeding." Because the process initiated by an application to show cause is a "proceeding," we conclude it constitutes an "action" within the meaning of section 614.1. *See id.* § 611.1; *see also Johnson v. Masters*, 830 N.W.2d 647, 654, 660–61 (Wis. 2013) (plurality opinion) (concluding postjudgment motions to enforce a judgment through entry of a qualified domestic relations order (QDRO) are subject to twenty-year statute of repose on actions to enforce a judgment or decree, but the repose period is tolled if the judgment on which relief is sought is not statutorily permitted); *id.* at 671–73 (Prosser, J., dissenting) (opining postjudgment motions to enforce a judgment through entry of a QDRO are subject to twenty-year repose period that is *not* tolled if the judgment on which relief is sought is not statutorily permitted).

Iowa Code section 611.1 provides that civil, special, and criminal proceedings are all actions. Iowa Code § 611.1. Section 611.2 defines a "civil action" as

> [a] proceeding in a court of justice in which one party, known as the plaintiff, demands against another party, known as the defendant, the enforcement or protection of a private right, or the prevention or redress of a private wrong.

*Id.* § 611.2. Civil actions also include proceedings to recover a plurality or forfeiture. *Id.* A "special action" is any "other proceeding in a civil case." *Id.*

At common law, contempt proceedings were either criminal or civil. *Phillips v. Iowa Dist. Ct.*, 380 N.W.2d 706, 708 (Iowa 1986). Criminal contempt was an "[o]ffense[ ] against the dignity or process of the court, whether committed in or out of the presence of the court." *Knox v. Mun. Ct.,* 185 N.W.2d 705, 707 (Iowa 1971). Civil contempt was an "[o]ffense[ ] against the party for whose benefit a court order was made." *Id.* Under early Iowa law, civil contempt was a proceeding of a special character, meaning the procedural rules that applied to civil actions also applied to contempt proceedings in the absence of specific statutory requirements to the contrary. *Kramer v. Rebman*, 9 Iowa 114, 118 (1859) (citing Iowa Code §§ 1515, 2516 (1851)).

Iowa Code chapter 665 (2013), located in the subtitle on "special actions," "constructively repealed the common law of contempt." *Phillips*, 380 N.W.2d at 708. The chapter treats "all actions for contempt [as] quasi-criminal, even when they arise from civil cases," meaning "contempt must be established by proof beyond a reasonable doubt." *Reis*, 787 N.W.2d at 68; *see also Phillips*, 380 N.W.2d at 708. Contempt proceedings in civil cases impose penalties; they do not involve adjudication of private rights or the recovery of a penalty or forfeiture. Thus, contempt proceedings remain of a special character and are classified as "special actions" under Iowa law.[8] *Cf. Blomdahl v.*

---

[8]Because a contempt proceeding is a "special action" under Iowa law, it is not subject to the requirement in Iowa Rule of Civil Procedure 1.301 that "a civil action is commenced by filing a petition with the court." *See Johnson*, 830 N.W.2d at 654 (plurality opinion) (rejecting argument that since civil actions commence with the filing and service of a summons and complaint, a postjudgment motion is not an "action upon a judgment or decree"). Further, because Iowa Code section 611.1 expressly defines "action," we find no merit in the proposition that "a motion within the context of the original action" should be distinguished from an "independent action" for purposes of this rule. *Cf. id.* at 654–55 (quoting *Hamilton v. Hamilton*, 661 N.W.2d 832, 836 n.4 (Wis. 2003)).

*Blomdahl*, 796 N.W.2d 649, 652 (N.D. 2011) (concluding that contempt actions are "special proceedings" but that by statute, special proceedings are expressly not "actions" under North Dakota statutory law).

Thus, we conclude the decision-making process initiated by an application to show cause is an "action" under the Iowa Code and subject to any relevant limitations periods in section 614.1. This is consistent with the holdings of other courts that have concluded contempt proceedings are "actions" for purposes of statutes governing the life of judgments and rules of civil procedure governing actions. *See, e.g.*, *Panther Pumps & Equip. Co. v. Hydrocraft, Inc.*, 566 F.2d 8, 23 (7th Cir. 1977) (concluding an order to show cause constituted "a subsequent proceeding to enforce the judgment (and injunction) rendered in 1970" and thus was a pending action for purposes of Federal Rule of Civil Procedure 25, which applied only to pending actions); *Moseley v. Smith*, 180 So. 3d 667, 674 (Miss. Ct. App. 2014) ("Because Smith's action is to enforce a court-entered judgment, and not merely a private contract, she had seven years to file her contempt action once the seven-year statute of limitations began to run."); *Simmons v. Simmons*, 290 N.W. 319, 320 (S.D. 1940) (concluding a 1939 contempt proceeding to enforce a 1918 judgment was not barred by the twenty-year statute of limitations on enforceability of judgments because the 1918 judgment was modified in 1936, resetting the limitations period).

We next consider whether an application to show cause to enforce an injunction is "founded on a judgment of a court of record" under section 614.1(6). District courts in Iowa are courts of general jurisdiction and also courts of record. *Marsh v. Hanna*, 219 Iowa 682, 684, 259 N.W. 225, 226 (1935). A "judgment" is defined as "[e]very final adjudication of any of the rights of the parties in an action." Iowa R. Civ. P. 1.951. In

other words, it is a judicial act that settles issues, defines rights or interests, or determines the liabilities of parties. *Giltner v. Stark*, 252 N.W.2d 743, 745–46 (Iowa 1977); *accord Van Gorden v. Schuller*, 192 Iowa 853, 858, 185 N.W. 604, 606 (1921). Although historically the term "judgment" may have applied only to a decision at law and "decree" to a decision in equity, we have long interpreted the term "judgment" in the statute on the limitations of actions to apply "to a final adjudication in an equity proceeding as well as to a judgment at law." *See Kramer*, 9 Iowa at 118–19 (reasoning to hold otherwise would exclude final chancery adjudications from every Iowa Code provision concerning judgments); *see also Burke v. Burke*, 142 Iowa 206, 210–11, 119 N.W. 129, 130–31 (1909) (finding statute on entries of decisions does not distinguish between judgments and decrees); 49 C.J.S. *Judgments* § 1, at 25 (2009) (noting terms "judgment" and "decree" are interchangeably used).

The 1977 judgment underlying this contempt action was entered by the Iowa District Court for Louisa County, a court of record. *See Marsh*, 219 Iowa at 684, 259 N.W. at 226. It constitutes a "final pronouncement which adjudicate[d] and determine[d] the issues in the case and define[d] and settle[d] the rights and interests of the parties so far as they relate to the subject-matter of the controversy." *Van Gorden*, 192 Iowa at 858, 185 N.W. at 606. This contempt action seeks judicial enforcement of an injunction granted in that judgment. Thus, this action is one that is founded on a judgment entered by a court of record.

Finally, we must assess whether this contempt proceeding qualifies for a "specially declared" exception under Iowa Code section 614.1. Iowa Code section 614.1(6) has no exception other than for "an action to recover a judgment for child support, spousal support, or a judgment of distribution of marital assets." *Id.* § 614.1(6). Our research discloses,

and the parties cite, no other exception "specially declared," and in particular, no exception excluding judgments granting injunctions, whether temporary or permanent, from the durational limitation on judgments prescribed in section 614.1(6).

We conclude the drainage district's application for order to show cause filed in February 2013 was an action seeking enforcement of the judgment entered in 1977. It was therefore an action subject to the twenty-year statute of limitations on enforcement of judgments under Iowa Code section 614.1(6). The twenty-year period commenced when the judgment was entered. Because the 1977 judgment was not renewed, it expired in 1997, well before the attempt to enforce it against DM&E was commenced. *See* Iowa Code § 614.1(6) (providing limitation period for actions on judgments); *Whitters*, 603 N.W.2d at 624–25 (discussing renewal by suit on a judgment). To hold otherwise would be to determine that proceedings to enforce an injunction initiated by an application to show cause or other postjudgment motion would be subject to no limitations period and thus "forever hold the defendant in fear of enforcement with no hope of repose." *Donovan v. Burgett Greenhouses, Inc.*, 759 F.2d 1483, 1486 (10th Cir. 1985) ("But we do not conclude that the secretary can, by obtaining an injunction, forever hold the defendant in fear of enforcement with no hope of repose. . . . Once the cause of action is reduced to judgment, the . . . issue then becomes one of the life of the judgment."); *see also Johnson*, 830 N.W.2d at 672 (Prosser, J., dissenting) ("[A]n interpretation that [the statute of limitations on actions to enforce a judgment] is inapplicable to motions, orders to show cause, and other proceedings not requiring a 'complaint' would mean, in effect, that there would be no time period for a party to bring certain kinds of actions upon a judgment.").

Our conclusion is not inconsistent with our determination in *Bear* that an injunction is enforceable in a contempt proceeding thirteen years later if the order creating the injunction did not limit its duration. 540 N.W.2d at 441–42. That case concerned the scope of our equitable authority to enforce an injunction that was well within the twenty-year statutory period to enforce judgments. *See id.* Our statements in that case suggesting a permanent injunction is not limited by the passage of time are correct statements of the principles of equity that govern injunctions, *see id.* at 441, but they are subject, of course, to limitations imposed by statute, *see Ney*, 891 N.W.2d at 450–51 (noting that statutory requirements supersede equitable requirements). Because the statute of limitations on judgments was not at issue in *Bear*, our reasoning in that case is not inconsistent with our holding today.

We acknowledge that an Illinois court has decided a similar issue differently. In *People ex rel. Illinois State Dental Society v. Norris*, the court rejected an argument that a writ of injunction lapsed under a statute of limitations on judgments, stating,

> On appeal the defendant first argues that the 1968 writ of injunction lapsed and became unenforceable because the injunction judgment had not been renewed by the plaintiffs through scire facias or other proceedings within seven years of its issuance. The defendant further contends that since the injunction expired prior to November of 1976, he should not have been subjected to contempt proceedings for acts allegedly committed in November and December of that year. We disagree. An injunction remains in full force and effect until it has been vacated or modified by the court which granted it or until the order or decree awarding it has been set aside on appeal. Such a decree or order must be obeyed, even if erroneous, until it is overturned or modified by orderly processes of review. An injunction can be modified or dissolved when the court finds that the law has changed or that equity no longer justifies a continuance of the injunction.

398 N.E.2d 1163, 1168 (Ill. App. Ct. 1979) (citations omitted).  Because we believe our statutory framework requires a different outcome, we do not find the Illinois court's decision persuasive.

"Limitation periods for causes of action are legislative pronouncements of policy barring actions for various policy reasons regardless of the merit of the action."  *Hamilton*, 661 N.W.2d at 842.  Limitations statutes

> represent a pervasive legislative judgment that it is unjust to fail to put the adversary on notice to defend within a specified period of time and that "the right to be free of stale claims in time comes to prevail over the right to prosecute them."

*United States v. Kubrick*, 444 U.S. 111, 117, 100 S. Ct. 352, 356–57 (1979) (quoting *Order of R.R. Telegraphers v. Ry. Express Agency, Inc.*, 321 U.S. 342, 349, 64 S. Ct. 582, 586 (1944)).  The Iowa legislature has expressly constrained the duration of judgments by prescribing that "[a]ctions may be brought within the times herein limited . . . and not afterwards, *except when otherwise specially declared.*"  *See* Iowa Code § 614.1 (emphasis added).  The legislature has elected to exempt only certain family-law judgments imposing ongoing obligations from the reach of section 614.1(6).  Finding no ground in this record for exempting the 1977 judgment from the operation of the statutory limitation period, we conclude the district court abused its discretion in enforcing the judgment through the court's contempt power.

### IV.  Conclusion.

The contempt proceeding in this case was an untimely action brought by the drainage district to enforce the 1977 judgment.  Because our resolution of this issue is dispositive of this appeal, we do not discuss or decide the other issues raised and argued on appeal.

Accordingly, we sustain the writ and vacate the contempt order against DM&E.

**WRIT SUSTAINED; CONTEMPT ORDER VACATED.**